*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
April 20, 2023

v

No. 358547
Genesee Circuit Court
LC No. 18-043032-FC

RAMON CURTIS POOL,

        Defendant-Appellant.

Before: GADOLA, P.J., and PATEL and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (sexual penetration with victim under 13 years of age), and one count of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(a) (sexual penetration with victim at least 13 years of age and under 16 years of age).[1] The trial court sentenced defendant to concurrent prison terms of 25 to 50 years each for the CSC-I convictions, and 5 to 15 years for the CSC-III conviction. The court's judgment of sentence also subjects defendant to lifetime electronic monitoring and requires him to register as a sexual offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.* We affirm.

## I. BACKGROUND

Defendant's convictions arise from allegations of ongoing sexual abuse perpetrated by defendant against his god sister, AL, beginning when she was 12 years old until she was 15 years old; defendant is eight years older than AL. The abuse initially involved defendant digitally penetrating AL's vagina and subsequently escalated to penile penetration of AL's vagina, fellatio, and cunnilingus. The last incident occurred on the evening of December 25, 2017, when AL was 15 years old, and involved defendant digitally penetrating her vagina. During this incident, AL excused herself to the bathroom and contacted a friend who urged AL to disclose defendant's

---

[1] The jury acquitted defendant of two additional counts of CSC-III, and one count of assault by strangulation, MCL 750.84(1)(b).

conduct to her parents. The following day, AL disclosed the ongoing sexual abuse perpetrated by defendant to various friends and family, and this ultimately led to defendant's apprehension and convictions.

## II. SPEEDY TRIAL

Defendant argues that he was denied his constitutional right to a speedy trial. We disagree. Despite the passage of 39 months between defendant's arrest and trial, he has failed to establish a speedy trial violation because the reasons for the delay only slightly favored defendant's claim, defendant did not assert his right to a speedy trial until 32 months after his arrest, and there has not been a sufficient showing of prejudice.

The United States and Michigan Constitutions guarantee criminal defendants the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20; *People v Patton*, 285 Mich App 229, 235 n 4; 775 NW2d 610 (2009). The determination whether a defendant was denied a speedy trial is a mixed question of fact and law. *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009). The trial court's factual findings are reviewed for clear error, while the constitutional issue is a question of law subject to de novo review. *Id.* "In determining whether a defendant has been denied a speedy trial, four factors must be balanced: (1) the length of the delay, (2) the reasons for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) prejudice to the defendant from the delay." *People v Mackle*, 241 Mich App 583, 602; 617 NW2d 339 (2000) (quotation marks and citations omitted).

## 1. LENGTH OF THE DELAY

The 39-month delay in this case was significant but, alone, it is not sufficient to warrant dismissal.

The delay period commences at the arrest of the defendant. *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006), citing *United States v Marion*, 404 US 307, 312; 92 S Ct 455; 30 L Ed 2d 468 (1971). In *Marion*, the United States Supreme Court held that "the Sixth Amendment speedy-trial provision has no application until the putative defendant in some way becomes an 'accused,'" which does not occur until either the defendant is arrested or formally charged. *Marion*, 404 US at 313, 320. In this case, defendant was arrested and jailed on April 3, 2018, and trial began approximately 39 months later on July 21, 2021. "A delay of more than eighteen months is presumed to be prejudicial and the burden is on the prosecution to prove lack of prejudice." *People v Simpson*, 207 Mich App 560, 563; 526 NW2d 33 (1994). "Although the length of delay in this case is considerable, there is no set number of days between a defendant's arrest and trial that is determinative of a speedy trial claim." *Waclawski*, 286 Mich App at 665. Thus, we must review the remaining factors.

## 2. REASONS FOR THE DELAY

The next factor requires and examination of the reasons for the delay and to whom they should be attributed. There were various reasons for the delay in this case. To the extent the delays were attributable to the prosecution, these reasons had a mostly neutral tint. Moreover, there were

delays following defendant's assertion of his speedy trial right that resulted from his request for new counsel. Therefore, on balance, this factor is given little weight.

When assessing the reasons for the delay, we must examine to whom the delay is attributable. In this case, the trial court examined the procedural history of the case, and there is no dispute with its findings regarding the substantial delays. The court attributed a 21-month delay to the prosecution and a 14-month delay (plus one additional month after defendant's motion to dismiss was denied) to the COVID-19 pandemic. The first trial date of November 14, 2018, was adjourned apparently because a prosecution witness was unavailable. While chargeable to the prosecution, an unavailable witness is a "valid reason" to "justify appropriate delay." *Barker v Wingo*, 407 US 514, 531; 92 S Ct 2182; 33 L Ed 2d 101 (1972). The second trial date of May 29, 2019 was adjourned without explanation; the third trial date of November 13, 2019 was adjourned because the prosecutor was in trial in another case; and the fourth and fifth trial dates of January 28, 2020 and March 12, 2020, respectively, were adjourned because of judicial reassignments. The prosecution is held accountable for unexplained or otherwise unattributable delays. *People v Lown*, 488 Mich 242, 261; 794 NW2d 9 (2011). Delays and docket congestion inherent in the court system are "technically attributable to the prosecution, [but] they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158 (1997) (quotation marks and citation omitted).

Regarding additional trial adjournments that were not attributable to the prosecution, the sixth trial date of June 23, 2020 was adjourned because of the COVID-19 pandemic. The trial court reasonably did not hold this delay against either party. See *United States v Smith*, 494 F Supp 3d 772, 783 (ED Cal, 2020) (holding that where "emergency health measures to limit the spread of COVID-19" were responsible for a delay in the defendant's trial, such delay should not weigh against the Government because "the Court's inability to safely conduct a jury trial is a good-faith and reasonable justification for the delay").[2] In this case, the prosecution was not responsible for the docket congestion and delays caused by COVID-19 safety protocols. Finally, the seventh trial date of June 22, 2021 was adjourned for a month because defendant requested a new attorney at the final pretrial hearing on June 17, 2021.

In sum, because most of the substantial delay chargeable to the prosecution had a "neutral tint," additional delays were caused by the COVID-19 pandemic, and some delays were chargeable to defendant, this factor is given little weight in determining whether defendant was denied a speedy trial.

3. ASSERTION OF RIGHT

---

[2] "While the decisions of lower federal courts and other state courts are not binding on this Court, they may be considered as persuasive authority." *People v Woodward*, 321 Mich App 377, 385 n 2; 909 NW2d 299 (2017).

This factor weighs heavily against dismissal because defendant did not assert his right to a speedy trial until 32 months had elapsed from the date of his arrest, and the seven-month delay that followed was attributable to the pandemic and defendant's request for new counsel.

With respect to the third factor, the assertion of the speedy-trial right, we look to when defendant asserted this right and when trial took place in relation to the assertion. See *Cain*, 238 Mich App at 113-114. Defendant first asserted his right to a speedy trial on December 16, 2020. We agree with the prosecution that, contrary to the trial court's finding, defendant did not assert his speedy-trial right on January 28, 2020. Defendant's specific request at that time was to be released on a personal recognizance bond and placed on tether because he had been awaiting trial. This was not a formal demand on the record to be brought to trial, but a clear request to modify the conditions of his bond. Thus, defendant waited 32 months after his arrest to assert his right to a speedy trial. "[W]e cannot ignore the fact" that such a substantial amount of time elapsed before defendant asserted his right. *Cain*, 238 Mich App at 113-114. While approximately seven additional months elapsed before the trial was conducted, this was primarily because the court could not conduct trials as a result of the pandemic. At the hearing on May 27, 2021, the court informed the parties that it would be conducting trials again, that three trials would be conducted at a time until the priority cases were tried, and that defendant's trial, which was 11th or 12th on the list, was scheduled to be conducted on June 22, 2021. However, the trial was then delayed for an additional month because defendant requested new trial counsel at the final pretrial hearing.

Under these circumstances, this factor weighs against defendant.

### 4. PREJUDICE

Defendant was not sufficiently prejudiced as to support a speedy trial violation because nothing in the record suggests that his defense suffered from the delay and because the anxiety defendant experienced during his pretrial incarceration is not alone sufficient.

With regard to the fourth factor, there are two types of prejudice: prejudice to the person and prejudice to the defense. *Gilmore*, 222 Mich App at 461-462. "Prejudice to the person results when pretrial incarceration deprives an accused of many civil liberties, and prejudice to the defense occurs when the defense might be prejudiced by the delay." *People v Levandoski*, 237 Mich App 612, 620 n 4; 603 NW2d 831 (1999). "Prejudice to the defense is the more serious concern because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citation omitted).

The record before us does not establish that defendant's incarceration during the delay prejudiced his person. Defendant states that he suffered anxiety because he was confined in jail, particularly for 15 months during the extremely "stressful time" of the COVID-19 shutdown. "However, anxiety, alone, is insufficient to establish a violation of defendant's right to a speedy trial." *Gilmore*, 222 Mich App at 462. Further, nothing in the record suggests that the delay adversely affected defendant's ability to defend against the charges; indeed, defendant makes no

argument at all on appeal regarding prejudice to the defense.[3]  In the trial court, defendant argued that, because of the passage of time, his and other witnesses' memories of the events were likely diminished.  However, general allegations of prejudice caused by delay, such as the unspecified loss of evidence or memory, are insufficient to show that his defense was affected.  *Id*.  Notably, defendant has not identified any specific beneficial testimony or evidence that was lost because of the delay.  "[T]he most important thing is that there is no evidence that a fair trial was jeopardized by delay . . . ."  *Williams*, 475 Mich at 264 (quotation marks and citation omitted).  In sum, defendant has failed to show that any potential witness testimony favorable to the defense or that other exculpatory evidence was lost because of the delay in bringing him to trial.

In conclusion, when balancing the relevant factors, defendant's right to a speedy trial was not violated.

### III.  SEX OFFENDER REGISTRATION

Next, defendant argues that the requirement of lifetime registration under SORA is cruel or unusual punishment in violation of the Eighth Amendment to the United States Constitution and the Michigan Constitution.  US Const, Am VIII; Const 1963, art 1, § 16.  We disagree.

Because defendant did not argue below that lifetime registration would be unconstitutionally cruel or unusual punishment, defendant's constitutional claim is unpreserved.  See *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013).  We therefore review this unpreserved claim for plain error affecting defendant's substantial rights.  *People v Carines*, 460 Mich 750, 752-753, 763-764; 597 NW2d 130 (1999).  A plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings."  *Id*. at 763.  Even if the three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence."  *Id*. at 763 (quotation marks, citation, and alteration omitted).

Requiring defendant to register as a sex offender for the rest of his life is not unconstitutionally cruel or unusual punishment.  Preliminarily, our Supreme Court, in resolving whether retroactive application of the 2011 version of SORA violated the Ex Post Facto Clause of the United States Constitution, held that the registration requirements under that version of the law are criminal punishments, *People v Betts*, 507 Mich 527, 558; 968 NW2d 497 (2021), and this Court reached the same conclusion with regard to the 2021 SORA, as adopted by 2020 PA 295, effective March 24, 2021.  *People v Lymon*, ___ Mich App ___, ___; ___ NW2d ___ (2022)

---

[3] "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority."  *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004).  Providing an issue with only "cursory treatment constitutes abandonment of the issue."  *Id*.

(Docket No. 327355); slip op at 18. As this Court recently explained in *People v Jarrell*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356070); slip op at 9:

> Neither opinion, however, answered whether mandatory lifetime registration under SORA necessarily constitutes cruel or unusual punishment. For instance, *Lymon* held only that SORA registration was "cruel or unusual punishment for a crime that lacks a sexual component and is not sexual in nature." *Id*. at 18. In that case, the defendant had been convicted of unlawful imprisonment of a minor and placed on the sex offender registry under SORA, but the crimes did not have any sexual component. *Id*. at 18-19. Here, of course, Jarrell's CSC-I conviction is sexual in nature, and thus *Lymon*'s limited holding does not apply. Therefore, we must next determine whether SORA registration, as applied to Jarrell's circumstances, constitutes cruel or unusual punishment.

Similarly, in this case, we must determine whether this registration penalty is cruel or unusual as applied to defendant.

To determine whether a punishment is cruel or unusual, courts assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. *People v Bullock*, 440 Mich 15, 33-34; 485 NW2d 866 (1992).

Regarding the harshness of the penalty compared to the gravity of the offense, the statutory maximum in Michigan for CSC-I is imprisonment for life, MCL 750.520b(2)(a). SORA, which requires defendant to register as a sexual offender, is a lesser punishment than life imprisonment. Thus, the penalty is not unduly harsh considering the gravity of defendant's crimes. Further, defendant was AL's stepfather's godson, whom AL considered her "best friend" and godbrother, and she testified that she did not consent to any of the multiple reported incidents. There was a significant age disparity between defendant, who was 20 or 21 years of age, and AL, who was age 12, at the time of two CSC-I incidents. Defendant treated AL differently from her siblings by spending more time with her, giving her more attention, and buying her more things from the time she was nine years old; AL testified that she now believes defendant had been grooming her. The assaults ended only because AL finally disclosed them at age 15. Thus, defendant took advantage of a child, and instilled in her lasting fear and distrust, which she described at trial and in a victim-impact statement. The gravity of defendant's offenses should not be discounted merely because he had no prior record. Considering the gravity of defendant's offenses and that he faced a statutory maximum life sentence for his CSC-I convictions, mandatory lifetime registration is not a disproportionately harsh punishment as applied to defendant. Moreover, the unique

circumstances surrounding CSC offenses justify the uniqueness of defendant's lifetime registration requirement.[4]

Next, defendant's mandatory lifetime sex offender registration is not unduly harsh compared to penalties imposed for other offenses in Michigan. This Court recently explained:

> For instance, depending on the age of the offender and victim, a CSC-I conviction may involve a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). Legislatively mandated sentences are presumptively proportional and presumptively valid, and a proportionate sentence is not cruel or unusual. [*Jarrell*, ___ Mich App at ___; slip op at 11 (quotation marks and citations omitted).]

Like the defendant in *Jarrell*, defendant has failed to overcome the presumption that mandatory lifetime sex offender registration is proportional as applied to his case, and he has not shown that the punishment is disproportionately harsh compared to other penalties imposed in Michigan. Further, defendant's mandatory lifetime sex offender registration is not an unduly harsh punishment when compared to punishments for similar offenses in other states, and thus not unique. In *Jarrell*, this Court observed that "[m]any states have a tiered system for sex offender registration, with lifetime registration reserved for the most heinous perpetrators of sexual assault." *Id*. Consequently, SORA's registration requirement is not materially different from sex offender registries in other states, and this supports a finding that it is not unduly harsh.

Lastly, regarding the impact of lifetime registration on rehabilitation, we agree with defendant that SORA's asserted rehabilitative effect will not assist his rehabilitation. In *Jarrell*, this Court observed this premise, citing our Supreme Court's recognition in *Betts*, 507 Mich at 556, 560-562, of a "growing body of research" that "sex-offender registries have dubious efficacy in achieving their professed goals of decreasing recidivism." *Jarrell*, ___ Mich App at ___; slip op at 11. However, given the strength of the other three factors, such a punishment is not cruel or unusual as applied to defendant's CSC-I convictions. For these reasons, SORA's lifetime registration requirement is not unjustifiably disproportionate as applied to defendant. *Bullock*, 440 Mich at 30.[5]

---

[4] Defendant's reliance on *People v DiPiazza*, 286 Mich App 137, 139-140; 778 NW2d 264 (2009), is misplaced because that case is factually inapposite; In *DiPiazza*, the defendant "was adjudicated under the Holmes Youthful Trainee Act (HYTA), MCL 762.11 et seq., for attempted third-degree criminal sexual conduct (CSC)" and was sentenced to probation due to a consensual relationship with a girl less than three years his junior. In that case, the girl's parents "knew of the relationship and condoned it" and the two were married five years later. *Id*. at 154.

[5] Defendant also argues that the imposition of lifetime electronic monitoring is unconstitutionally cruel or unusual punishment, and that it constitutes an unreasonable search. However, as defendant recognizes, this Court considered and rejected these same arguments when it decided *People v Hallak*, 310 Mich App 555, 571-581; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016). This Court is bound to follow its own precedent. MCR 7.215(J)(1). We note

Affirmed.

/s/ Michael F. Gadola
/s/ Sima G. Patel
/s/ Allie Greenleaf Maldonado

---

that our Supreme Court has ordered the Macomb County Prosecuting attorney to answer an application for leave to appeal and address this issue. *People v Kardasz*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 165008). However, this does not diminish the precedential effect of *Hallak*. See MCR 7.215(C)(2).